UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SHELBY TRAHAN, INDIVIDUALLY          CIVIL ACTION NO. 6:14-cv-00722
AND ON BEHALF OF HIS DECEASED
FATHER, ADAM JAMES TRAHAN

VERSUS                               MAGISTRATE JUDGE HANNA

WAYNE MELANCON, ET AL.               BY CONSENT OF THE PARTIES

## MEMORANDUM  RULING

Currently pending is the re-urged motion for summary judgment (Rec. Doc. 66), which was filed on behalf of the defendants, former Acadia Parish Sheriff Wayne Melancon, Deputy Sheriff Tyler Broussard, and former Deputy Sheriff Conan Smith.[1] Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the motion is GRANTED IN PART and the plaintiff's federal claims will be dismissed.

## BACKGROUND

This lawsuit was brought by Shelby Trahan, individually and on behalf of his deceased father, Adam James Trahan (hereinafter "Mr. Trahan") who died after being shot by Deputy Broussard. The shooting occurred during an altercation inside the

---

[1]      Sheriff Melancon retired in 2015. KLFY News 10, http//www.klfy.com/2015/10/29/ voters-elect-k-p-gibson-as-new-acadia-parish-sheriff (last visited Feb. 21, 2017).  The defendants asserted in their briefing that Deputy Smith received a medical disability retirement due to the injuries sustained in the subject incident.  (Rec. Doc. 66-1 at 10).

residence occupied by the decedent and his girlfriend Tammy Bankston on April 6, 2013.  In his original complaint, the plaintiff alleged that the defendants violated Mr. Trahan's Constitutional rights, and he asserted state-law claims of assault and battery. The plaintiff also asserted claims, under Louisiana law, for Mr. Trahan's survival between the time he was injured and his death and for his allegedly wrongful death. In his first amended complaint, the plaintiff added a claim against Acadian Ambulance Service, but that claim was dismissed (Rec. Docs. 62, 63).[2]

The defendants contend that the deputies did not violate the Fourth Amendment when they entered Mr. Trahan's residence because the situation presented exigent circumstances, that the force used by the deputies was reasonable under the circumstances, and that the defendants are entitled to qualified immunity, protecting them from suit.  The defendants further contend that the claims asserted against Sheriff Melancon and Deputy Smith are unsupported by factual evidence in the record, that there is no basis for awarding punitive damages, and no evidence to support a spoliation claim.  They seek dismissal of all of the claims asserted against them in this lawsuit.

---

[2]     Because the claim against Acadian Ambulance was dismissed, the Court will not address the plaintiff's claim that Acadian Ambulance failed to render aid to Mr. Trahan.

The plaintiff contends that there is a genuine issue of material fact concerning (1) whether Ms. Bankston or Mr. Trahan had a preexisting relationship with Deputy Smith; (2) the deputies' arrival at and analysis of the scene; and (3) what happened inside the home at the time of the shooting. The plaintiff further contends that the deputies' warrantless entry into the residence and the use of deadly force violated Mr. Trahan's Constitutional rights; that the unreasonableness of the deputies' actions precludes qualified immunity; and that the unreasonableness of the deputies' actions mandates an award of punitive damages.

## ANALYSIS

### A.    MOTION FOR SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[3] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[4]

---

[3]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[4]    *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252); *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[5]  If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[6]

All facts and inferences are construed in the light most favorable to the nonmoving party,[7] but the nonmoving party may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial.[8]  After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted.[9]

---

[5]        *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[6]        *Washburn v. Harvey*, 504 F.3d at 508.

[7]        *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

[8]        *Internat'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A.*, 199 F.3d 796, 798 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248–49).

[9]        *Internat'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A.*, 199 F.3d at 798 (citing *Celotex Corp. v. Catrett*, 477 U.S. at 322).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.[10]   The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[11]

## B.   THE STANDARD FOR EVALUATING A SECTION 1983 CLAIM

The complaint states that the plaintiff's claims are brought pursuant to 42 U.S.C. §§ 1983 and 1988 as well as under Louisiana law.  Section 1983 provides a cause of action against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another person's Constitutional rights.  Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere.[12]   To state a section 1983 claim, a plaintiff must:  (1) allege a violation of a right secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed

---

[10]   *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325).

[11]   *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

[12]   *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979); *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004).

by a person acting under color of state law.[13]  In this case, the defendants do not contest whether Sheriff Melancon, Deputy Broussard, or Deputy Smith acted under color of law at any relevant time, but they do challenge whether the defendants' actions or omissions are Constitutional violations.

## C.    THE STANDARD FOR EVALUATING QUALIFIED IMMUNITY

Qualified immunity, an affirmative defense to a suit under 42 U.S.C. § 1983, protects government officials in their individual capacity, while performing discretionary functions, not only from suit, but from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[14]  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[15]

---

[13]     *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013); *Moore v. Willis Independent School Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

[14]     *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  See, also, *Prison Legal News v. Livingston*, 683 F.3d 201, 224 (5th Cir. 2012); *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc).

[15]     *Whitley v. Hanna*, 726 F.3d at 638 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Although qualified immunity is "nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised."[16]   The Supreme Court recently set forth the analysis this Court must follow:

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.] .When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.
>
> The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [T]he salient question is whether the state of the law at the time of an incident provided "fair warning" to the defendants that their alleged [conduct] was unconstitutional.
>
> Courts have discretion to decide the order in which to engage these two prongs.  But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.  This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to

---

[16]     *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d at 326).

judgment as a matter of law.  In making that determination, a court must view the evidence in the light most favorable to the opposing party.

Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when a court decides only the clearly-established prong of the standard.  In cases alleging unreasonable searches or seizures, we have instructed that courts should define the "clearly established" right at issue on the basis of the specific context of the case.  Accordingly, courts must take care not to define a case's context in a manner that imports genuinely disputed factual propositions.[17]

In this case, the plaintiff has not presented sufficient evidence to negate the application of qualified immunity as to any of the named defendants.  Accordingly, Sheriff Melancon, Deputy Broussard and Deputy Smith are entitled to qualified immunity, and the claims against them in their individual capacities must be dismissed.

## D.   FACTUAL FINDINGS

The determination of the material facts at issue can, for the most part, be derived from the dashboard camera video recording made by the video camera in Deputy Broussard's vehicle.  The United States Supreme Court has stated that, even at the summary judgment stage, the facts should be viewed in the light depicted by a videotape of the incident.[18]  As noted by the Fifth Circuit, "we assign greater

---

[17]   *Tolan v. Cotton,* ___ U.S. ___, 134 S.Ct. 1861, 1865-66 (2014) (internal quotation marks and citations omitted).  See, also, *Pratt v. Harris Cty. Tx.,* 822 F.3d 174, 181 (5th Cir. 2016).

[18]   *Scott v. Harris*, 550 U.S. 372, 381 (5th Cir. 2007).

weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene."[19]  Nonetheless, the video must be viewed by the Court from the perspective of a reasonable officer.[20]  Thus, this Court's analysis will focus to the maximum extent possible on the factual scenario depicted on the recording from Deputy Broussard's dashboard camera since that record depicts a significant part of the interaction between Deputy Broussard, Deputy Smith, Ms. Bankston, and Mr. Trahan.  There is no audio and the actual altercation with Mr. Trahan is not depicted, nor does he ever even come into view, on the video.  However, the actions taken and the statements made at the time of the shooting are consistently described in the testimony of the only three witnesses – Deputy Broussard, Deputy Smith, and Ms. Bankston.  Although the plaintiff suggests that the video is inconsistent with the deposition testimony of the deputies and Ms. Bankston, there are no allegations or indications that the videotape was altered in any way and there is no material difference between the testimony and what can be seen on the video.  Based on the competent evidence presented, the following facts are not in dispute.

Deputy Broussard was going off shift and Deputy Smith was coming on shift when they received a radio dispatch call for a possible domestic disturbance and shots

---

[19]     *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).  See, also, *Poole v. City of Shreveport*, 691 F.3d at 627.

[20]     *Foster v. Carroll County*, 502 Fed. App'x 356, 359 (5th Cir. 2012).

fired at an address in Acadia Parish, which had been phoned in by a neighbor.  Both deputies proceeded to the address, which turned out to be the residence of Mr. Trahan and his girlfriend, Tammy Bankston.  Deputy Broussard parked his unit in front of the house so that the unit's spotlight was directed to the open front door and he left his dashboard camera running.  Deputy Broussard went to the left side of the open door, and Deputy Smith went to the right side.  The contents inside the residence are visibly in disarray on the video.  Although both deputies had a hand on their holstered sidearm, neither had his weapon actually drawn.

Ms. Bankston came to the door and told the officers that everything was all right.  As Ms. Bankston stepped outside and attempted to pull the door closed behind her, Deputy Smith pushed the door open with his weapon still not drawn.  As he did so, Deputy Smith saw Mr. Trahan standing in the house with an empty holster on his hip and his arms crossed over his chest with his hands under his armpits.  Deputy Smith asked Mr. Trahan to come outside, and he asked Mr. Trahan to show his hands. Mr. Trahan did not answer.  As Deputy Broussard peered into the house from the opposite side of the door, he too could see Mr. Trahan standing with his arms crossed and his hands under his armpits.  He also observed the empty holster.  Deputy Broussard drew his weapon and instructed Mr. Trahan to come out of the house and

to show his hands.  Mr. Trahan did not come out of the house.  He briefly showed the palms of his hands but did not move his arms away from his sides.

Deputy Broussard holstered his weapon and, as he entered the house, he unholstered his taser.  After Mr. Trahan briefly showed his palms but failed to raise his arms, Deputy Broussard threatened to tase Mr. Trahan if he did not show his hands.  Mr. Trahan replied, "you're going to have to shoot me in the back," and began walking toward a sofa that was facing away from the door.  As Mr. Trahan began to bend over the back of the sofa, Deputy Broussard deployed his taser.  The taser did not have the desired effect of incapacitating Mr. Trahan.  Mr. Trahan remained standing up but in a bent over position.  Mr. Trahan then started coming up, holding a camouflage-patterned shotgun that he had picked up off the sofa.  Deputy Broussard observed that the shotgun was being held in both of Mr. Trahan's hands, with the barrel pointing to the left.  Deputy Broussard threw the taser to the floor and jumped on Mr. Trahan's back in an attempt to wrestle him to the ground.  At this point, for the first time, both deputies were actually in the house and Ms. Bankston was looking in the door.  The shotgun went off, shooting Deputy Smith in the leg, and Deputy Smith screamed.  Deputy Broussard and Mr. Trahan fell to the ground.  Mr. Trahan raised his right arm and began wrapping it around Deputy Broussard's head to put him in a headlock.  Deputy Broussard unholstered his weapon and fired a couple of

rounds, striking Mr. Trahan once in the chest.  Mr. Trahan fell forward, with the barrel of the shotgun under his body.  Mr. Trahan began attempting to get up, and Deputy Broussard saw the shotgun moving.  Ms. Bankston, who was watching through the doorway, entered the house while Deputy Smith, although suffering from a shotgun blast to his leg, attempted to wrest the shotgun away from Mr. Trahan.  At that point, Deputy Broussard fired more rounds, striking Mr. Trahan twice in the back.  Deputy Smith pushed the shotgun out of the house.  Deputy Broussard reholstered his weapon, rolled Mr. Trahan onto his left side, and used a cloth to stanch the bleeding.  Because Mr. Trahan was still moving and Deputy Broussard still did not know where Mr. Trahan's pistol was, Deputy Broussard handcuffed Mr. Trahan.  He then went to check on Deputy Smith and used his radio to call for assistance.

The deputies consistently testified that Mr. Trahan failed to comply with their instructions to exit the house and to show his hands.  Deputy Broussard twice attempted to de-escalate the situation by first holstering his weapon and using his taser and then using bodily force rather than a weapon in an attempt to stop Mr. Trahan after Mr. Trahan retrieved a shotgun.  It was only after Mr. Trahan fired the shotgun and wounded Deputy Smith that Deputy Broussard shot Mr. Trahan.

-12-

The plaintiff is correct that the dashcam video does not depict what occurred inside the house once the deputies entered and before the shots were fired.  However, there was no evidence presented that rebuts the deputies' version of events.  The plaintiff argues that the video shows "flashes from multiple gunshots that occur almost simultaneously before the wadding and pellets from the shotgun blast can be seen leaving the home." (Rec. Doc. 69 at 7).  Having viewed the video many times, the Court observed no such flashes.

Ms. Bankston's testimony concerning what happened does not create any material factual disputes.  Ms. Bankston confirmed that the shotgun was on the sofa before the deputies entered the house.  Ms. Bankston can be seen on the video looking in the door when the deputies entered.  She testified that Mr. Trahan had the shotgun in his hand before shots were fired and that the deputies told him to put the shotgun down.  She confirmed that there was a struggle between Mr. Trahan and one of the deputies.  Although she heard gunshots, she did not know which gun was shot first.  Consequently, her testimony does not refute the version of events related by the deputies.

The entire sequence of events from the time of the deputies' arrival until the shotgun was removed from the house occurred over seventy-five seconds as indicated in the following time line taken from the video:

4:45        Broussard arrives – the door is open.

4:51        Smith walks around to the right side of the carport where he has a view through the open door.

4:56        Bankston pulls the door to close it – but it does not completely close.

4:59        Smith taps the door open – his weapon is not drawn.

5:04        Broussard sticks his head in the left side of the door.

5:10        Broussard draws his weapon while he is still outside the house.

5:14        Broussard steps backwards.

5:17        Broussard holsters his weapon.

5:19        Broussard enters the door and pulls out his taser.

5:25        Smith is right behind Broussard, and he gestures to Bankston to stay back.

5:28        Broussard and Smith rapidly move into the house out of view of the camera.

5:31        Bankston is in the doorway looking into the house.

5:32        Shotgun blast – Bankston ducks away.

5:34        Bankston looks back in the door and enters the residence.

5:38-43     Smith's arm and head are visible while he is grappling with the shotgun.

5:44-59     No persons are visible enough to identify them.

6:00          Smith carries the shotgun out of the house.

Of particular significance to the Court is that only three to four seconds elapsed between the time that Deputy Broussard and Deputy Smith moved into the house out of view and the shotgun was discharged.  During those critical seconds, Deputy Broussard testified he saw the shotgun, dropped his taser and tried to tackle Mr. Trahan. He had no form of lethal force deployed. At the time Deputy Smith entered the residence out of view of the camera, he also had no form of lethal force deployed. In the next ten seconds, during which the fatal shots were fired by Deputy Broussard, the video demonstrates that Deputy Smith was fighting to gain control of the shotgun at the same time a civilian was in the immediate area of the altercation in the house. During that ten seconds, the testimony is consistent that Deputy Broussard was struggling unsuccessfully to gain control of the individual who had just fired the shotgun and who possibly could have been in possession of a handgun.  The Court finds the video depiction of the removal of the shotgun from the house to be consistent with the deputies' testimony.

**E.    THERE WAS NO FOURTH AMENDMENT VIOLATION BASED ON THE ABSENCE OF A WARRANT.**

The plaintiff alleged that the deputies violated Mr. Trahan's Fourth Amendment rights by entering his home without a warrant.  This argument lacks merit.

"[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable, [but] what is reasonable depends on the context within which a search takes place."[21]  "A warrantless search is presumptively unreasonable unless it falls within an exception to the Fourth Amendment's warrant requirement."[22] Under the exigent circumstances exception, police officers are not required to obtain a warrant if "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable."[23]   Under the exigency exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."[24]

It is undisputed that the deputies entered Mr. Trahan's residence without a warrant; however, the Court finds that the exigencies of the situation made their entry

---

[21]     *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).

[22]     *United States v. Guzman*, 739 F.3d 241, 245 (5th Cir. 2014) (citing *United States v. Karo*, 468 U.S. 705, 717 (1984)).

[23]     *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978)) (internal quotation marks omitted).

[24]     *Brigham City, Utah v. Stuart*, 547 U.S. at 403.

into the residence objectively reasonable.  The deputies were responding to a domestic dispute with a report of shots fired.  The video shows Deputy Broussard arriving at the house where the door is standing open.  Deputy Smith walks around to the right side of the carport where he has a clear sight line into the house where the contents are visibly in disarray.  Ms. Bankston steps out of the house and pulls the door to close it behind her, but the door does not completely close.  Deputy Smith taps the door, and it reopens.  Deputy Broussard sticks his head in the door, and at that point both deputies observed Mr. Trahan wearing an empty holster.  They did not know the location of the handgun that fit the holster.  Although Ms. Bankston attempted to assure the deputies that everything was all right when they encountered her at the door of the house, it was reasonable for the deputies to suspect that Mr. Trahan might be intending to harm Ms. Bankston or himself once they saw inside. When Mr. Trahan refused to show his hands, it was reasonable for them to enter the home in order to attempt to diffuse the situation.

Viewing the summary judgment evidence in the light most favorable to the plaintiff, as is required, the Court concludes that there were exigent circumstances that made it reasonable for the deputies to enter the home.  Accordingly, both deputies are entitled to qualified immunity with regard to their warrantless entry into Mr. Trahan's residence.

F.   **NO EXCESSIVE FORCE WAS USED.**

In this case, Mr. Trahan's death was caused by the deadly force employed by Deputy Broussard.  There is no allegation – and no evidence – that Deputy Smith employed any force against Mr. Trahan except for his attempts to get the shotgun away from Mr. Trahan after Mr. Trahan had already shot him.  Therefore, the issue to be resolved is whether Deputy Broussard's use of deadly force was reasonable. The Court finds that it was.

To prevail on a Fourth Amendment excessive force claim, a plaintiff must establish "(1) injury (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[25]  A determination of whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the amount of force used against the need for force.[26]

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . .  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense,

---

[25]     *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007).   See, also, *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000).

[26]     *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008).

-18-

uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.[27]

When deciding the question of whether the force used was unreasonable, the court must determine whether the totality of the circumstances justified the particular use of force.[28]  The use of deadly force is presumed to be reasonable when the police officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others.[29]

In this case, viewing the summary judgment evidence in the light most favorable to the plaintiff and balancing the amount of force used against the need for force, as is required, the Court concludes that the amount of force used was reasonable under the circumstances.  Deputy Broussard and Deputy Smith were responding to an alleged domestic violence situation involving gunshots already having been fired.  When they first observed Mr. Trahan, he was wearing an empty holster with no sign of the pistol nearby.  After refusing their instructions, Mr. Trahan picked up and fired a shotgun, injuring one of the officers, and was in a fight with the other officer over the shotgun while an innocent civilian was in the room.  It was not

---

[27]     *Graham v. Connor*, 490 U.S. at 396–397 (internal quotation marks and citations omitted).

[28]     *Ramirez v. Knoulton*, 542 F.3d at 128; *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

[29]     *Orr v. Copeland*, 844 F.3d 484, 493 (5th Cir. 2016); *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009).

until after Mr. Trahan fired the shotgun and injured Deputy Smith that Deputy Broussard unholstered his weapon and used deadly force against Mr. Trahan.  It was reasonable for Deputy Broussard to use deadly force after his attempts to tase and tackle Mr. Trahan proved ineffective, especially since at that point he knew that Deputy Smith had been hit with gunfire and he was engaged in a struggle with Mr. Trahan who remained capable of firing the shotgun.

This Court also finds that there was no clearly established statutory or Constitutional right that gave the Deputy Broussard "fair warning" that he could not use deadly force under the circumstances where (1) in response to a domestic violence call with shots fired, (2) the victim is seen with an empty holster and no sign of the weapon, (3) the victim refuses to follow instructions and retrieves a shotgun which discharges *after* multiple attempts to use non-deadly force have proved unsuccessful, and (4) the victim does not relinquish the shotgun without resistance.

It is well-established that the excessive force inquiry is confined to whether the officer or another person was in danger at the moment of the threat that resulted in the officer's use of deadly force.[30]  The United States Supreme Court held that officers did not violate the Fourth Amendment in using potentially deadly force when the officers

---

[30]     *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014);  *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001).

knew that the suspect had a weapon, had threatened to use it to kill three people, the officers had unsuccessfully attempted to subdue the suspect with pepper spray, and the suspect was only a few feet from a cornered officer.[31]

The Fifth Circuit has declined to find excessive force when a police officer shot and killed a robbery suspect after the suspect repeatedly refused to keep his hands raised and appeared to be reaching for an object.[32]  The same principle was used to find the use of deadly force reasonable where the decedent was engaged in an armed struggle with police officers and the officers had a reasonable belief that he posed an imminent risk of serious harm to the officers.[33]  Similarly, when officers entered a bedroom to determine whether the occupant had overdosed on sleeping pills and he stood up with a knife raised over his head in a posture suggesting a stabbing motion, "the district court properly held that under these circumstances, the officers reasonably fear for their safety at the moment of the fatal shooting."[34]

---

[31]     *City and County of San Francisco v. Sheehan*, ___ U.S.___, 135 S.Ct. 1765, 1775 (2015).

[32]     *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991).

[33]     *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d at 493.

[34]     *Harris v. Serpas*, 745 F.3d at 773.

The plaintiff contends that *Mason v. Lafayette City-Parish Consolidated Government*[35] mandates a different result in this case.  In that case, Mason went to his girlfriend's apartment.  When he saw through the window that another man was there for dinner, he became upset, banging on the door and yelling.  The girlfriend locked herself in the bedroom with the other man and another guest, and her roommate let Mason into the apartment.  When the girlfriend opened her bedroom door, Mason entered with a gun.  In the meantime, one of the guests called the police.  By the time the police arrived, the situation was in hand, but the gun was still in Mason's waistband.  An officer yelled "gun" and sent his K-9 to attack Mason.  The officer claimed that Mason's right hand went to his side before the dog was released and further claimed that Mason's hand touched the gun after the dog attacked.  The officer fired five shots, striking Mason in the chin, right shoulder, upper right arm, chest, and upper left arm.  The officer stated that Mason was still trying to reach for the gun thereafter, so he fired two more shots into Mason's back.  The court emphasized that an exercise of force that is reasonable at one moment can become unreasonable in the next moment if the justification for the use of force has ceased, and noted that the district court did not expressly address whether the two separate uses of the officer's firearm were both justified.  There was conflicting testimony from the officers and

---

[35]     *Mason v. Lafayette City-Parish Consolidated Gov't*, 806 F.3d 268 (5th Cir. 2015).

from the girlfriend concerning whether Mason posed a threat of serious physical harm at the time the two final shots were fired, and the forensic pathologist testified that the gunshot to Mason's right arm would have severely restricted the movement of his arm.   On that basis, the Fifth Circuit found that a reasonable jury could have concluded that Mason no longer posed a threat to the officer and that firing the final two shots violated the Fourth Amendment.

Although Deputy Broussard fired two sets of rounds, striking Mr. Trahan a total of three times, there is no evidence whatsoever that Mr. Trahan was subdued when the second set of rounds were fired.   After the shotgun was fired, Deputy Broussard fired a couple of rounds.   One of those rounds struck Mr. Trahan in the chest.   The testimony is consistent, and the video confirms to some extent, that Deputy Broussard was struggling with Mr. Trahan after the first rounds were fired. Deputy Broussard observed the barrel of the shotgun sticking out of the upper part of Mr. Trahan's body and Mr. Trahan began moving and appeared to be pushing himself up off the floor with the shotgun still underneath him.   The video shows Deputy Smith also fighting to gain control of the shotgun.   At some point during those few seconds, Deputy Broussard perceived an imminent threat and fired again, this time into Mr. Trahan's back.

The coroner's report showed that Mr. Trahan was struck by three bullets, one in the left chest, one in the right back, and one in the left back.[36]  The coroner testified that Mr. Trahan could have been argumentative and fighting after the first shot was fired.[37]  This is consistent with Deputy Broussard's testimony that Mr. Trahan was still moving and attempting to get up off the floor after the first shots were fired.

Thus, this factual scenario is very different from that presented in the *Mason* case.  There is no evidence contradicting Deputy Broussard's version of the events and the coroner corroborated Deputy Broussard's perception that Mr. Trahan still posed a threat after he was wounded by the first set of shots.  Therefore, the risk presented by Mr. Trahan did not cease between Deputy Broussard's firing the first set of rounds and firing the second set of rounds.  When Deputy Broussard fired the two shots into Mr. Trahan's back, Deputy Broussard still had a reasonable belief that Mr. Trahan posed an imminent risk of serious harm.  The Court accordingly concludes that Deputy Broussard's use of deadly force was reasonable under the circumstances in which he found himself at that moment.

The plaintiff suggests that there might have been a preexisting relationship between Mr. Trahan and Deputy Smith due to Deputy Smith and Mr. Trahan's son

---

[36]     Rec. Doc. 69-8 at 1-2.

[37]     Rec. Doc. 66-6 at 14.

Shelby having been in a prior altercation.  The plaintiff also suggests that there might have been a preexisting relationship between Deputy Smith and Ms. Bankston due to certain social media posts.  No competent evidence was presented to establish the existence of either claimed relationship, and no competent evidence was presented to establish that either claimed relationship resulted in the deputies acting unreasonably after entering the plaintiff's home.  Therefore, the Court finds that, even if the alleged relationships did exist, those relationships were not material to the reasonableness of the deputies' actions on the night in question.

## G.   THE CLAIMS AGAINST SHERIFF MELANCON.

In addition to his claims against Deputy Broussard and Deputy Smith, the plaintiff also asserted claims against Acadia Parish Sheriff Wayne Melancon in both his individual capacity and his official capacity.  "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability."[38]  In a Section 1983 action, a supervisory official may be held liable only if:  (a) he affirmatively participated in the acts that resulted in a constitutional deprivation; or (b) he implemented unconstitutional policies that resulted in the

---

[38]     *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (quoting *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)).

plaintiff's injury.[39]   To establish supervisor liability for constitutional violations committed by subordinate employees, the plaintiff must show that the supervisor acted or failed to act with deliberate indifference to the violation of others' constitutional rights committed by their subordinates.[40]   Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action."[41]

In this case, there is no allegation that Sheriff Melancon was present at Mr. Trahan's residence on the night in question.  Furthermore, no evidence was presented to show that Sheriff Melancon instituted an unconstitutional policy that was being followed by the two deputies when they responded to the dispatcher's call and then encountered Mr. Trahan.  Finally, there is no evidence that Sheriff Melancon acted or failed to act with deliberate indifference to the constitutional violations allegedly committed by the two deputies.  "A complete failure of proof concerning an essential element of the nonmoving party's case is fatal and entitles the moving party to judgment as a matter of law."[42]   Consequently, there is no basis for the claims against

---

[39]     *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011); *Gates v. Texas Depot of Prot. & Reg. Serve.*, 537 F.3d 404, 435 (5th Cir. 2008).

[40]     *Porter v. Epps*, 659 F.3d at 446.

[41]     *Porter v. Epps*, 659 F.3d at 446-47; *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).

[42]     *Ledesma v. Swartz*, No. 2:96-CV-0491, 1998 WL 355480, at *2 (N.D. Tex. June 26, 1998) (citing *Celotex v. Catrett*, 477 U.S. at 322-23).

Sheriff Melancon.  All of the plaintiff's claims against Sheriff Melancon will be dismissed.

## H.   THE PUNITIVE DAMAGES CLAIMS.

The complaint seeks the imposition of punitive damages against Deputy Broussard and Deputy Smith in their individual capacities.  Although punitive damages are not recoverable in Section 1983 claims against a municipality[43] or its officials acting in their official capacities, punitive damages can be recovered in a Section 1983 individual-capacity claim.[44]  In order to assess punitive damages under 42 U.S.C. § 1983, there must be facts establishing that the defendant's conduct was motivated by evil motive or intent or involved reckless or callous indifference to the federally-protected rights of others.[45]  In this case, the plaintiff has not satisfied his burden of establishing that the deputies acted with a reckless or callous disregard for

---

[43]     A Section 1983 claim against a Louisiana sheriff in his official capacity "is 'in essence' a suit against a municipality."  *Brown v. Strain*, 663 F.3d 245, 251 (5th Cir. 2011) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)); *Williams v. Gusman*, No. 15-64, 2015 WL 4509762, at *2 (E.D. La. July 24, 2015).  See, also, *Bouchereau v. Gautreaux*, No. 14-805-JWD-SCR, 2015 WL 5321285, at *13 (M.D. La. Sept. 11, 2015); *Jordan v. Prator*, No. 11-0723, 2013 WL 4094336, at *5 (W.D. La. Aug. 13, 2013).

[44]     *Smith v. Wade*, 461 U.S. 30, 35 (1983).  See, also, *Howell v. Town of Ball*, No. 12–951, 2012 WL 3962387, at *4 (W.D. La. Sept. 4, 2012) (citing *Cook County, Ill. V. U.S. ex rel. Chandler*, 538 U.S. 119 (2003); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); and *Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984)).

[45]     *Smith v. Wade*, 461 U.S. at 56.

Mr. Trahan's rights or that their actions were motivated by an evil motive or intent. Therefore, the plaintiff is not entitled to punitive damages under Section 1983.

## I.   THE STATE-LAW CLAIMS

The plaintiff asserted state-law claims of assault and battery against the two deputies, as well as state-law survival and wrongful death claims against the defendants, based on the allegations of warrantless entry and use of excessive force. In support of the motion for summary judgment, the defendants argued that these claims should be dismissed.  Having concluded that the plaintiff's federal-law claims against the defendants should be dismissed, there is no remaining federal question before the court.  Although this fact alone does not divest the court of jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims."[46]  Moreover, the general rule in this circuit is to dismiss state claims when the federal claims they supplement are

---

[46]     *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)

dismissed.[47]  Therefore, the Court declines to exercise its supplemental jurisdiction, and the plaintiff's state-law claims will be dismissed without prejudice.

## J.   THE SPOLIATION CLAIM.

In his complaint, the plaintiff asserted a spoliation claim, arguing that some evidence was either withheld or intentionally destroyed.  Black's Law Dictionary defines spoliation as "[t]he *intentional* destruction, mutilation, alteration, or concealment of evidence."[48]  Therefore, absent bad faith by the party alleged to have spoiled the evidence, the Fifth Circuit will not find that spoliation occurred.[49]  There is no substantive cause of action for spoliation under federal law,[50] and the Court declines to address the tort of spoliation under Louisiana law.

---

[47]     *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999); *Parker & Parsley Petroleum Co. v. Dresser Industries*, 972 F.2d 580, 585 (5th Cir. 1992); *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989).

[48]     Black's Law Dictionary, Ninth Edition at 1531 [emphasis added.]

[49]     See, e.g., *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000) (holding district court did not err in refusing to instruct jury on spoliation where there was no evidence that government acted with bad faith); *United States v. Livingston*, 243 Fed. App'x 37 (5th Cir. 2007).

[50]     *Jones v. Houston Independent School Dist.*, No. H-08-3742,  2010 WL 1904324, at *1 (S.D. Tex. May 10, 2010) ("This Court could find no authority recognizing a spoliation claim under the federal common law and in *Russell v. University of Texas of the Permian Basin*, 234 Fed. Appx. 195 (5th Cir. 2007), . . . the Fifth Circuit limited its discussion of spoliation to the propriety of refusing an adverse inference jury instruction."); *Williams v. McCollister*, No. L-08-131, 2009 WL 4250021, at *3 (S.D. Tex. Oct, 6, 2009) ("As it is not a separate cause of action, an adverse inference based on spoliation of evidence is best classified as an evidentiary presumption. . . .").

The Court finds that, aside from the plaintiff's conjecture, no evidence of spoliation has been presented that would have any impact on the Court's decision. Any photographs taken at the scene after the shooting had already occurred would not likely be relevant to figuring out what happened during the altercation or whether the deputies' actions were or were not reasonable.  The mere fact that a sofa was flipped over (as depicted in some of the photographs) after the incident occurred does not prove that the scene was staged to make it look like a pistol was readily at hand, as the plaintiff suggests.  Moreover, the Court's decision on the reasonableness of the deputies' actions does not take into consideration the location of Mr. Trahan's handgun at any time – except for the fact that it was not in his holster.

Accordingly, the Court finds that there is insufficient evidence to support a conclusion that anyone materially altered, lost, or destroyed any relevant evidence that would have any impact on the Court's decision applicable to the federal claims.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (Rec. Doc. 38) is GRANTED IN PART.  The motion is granted with regard to the plaintiff's Section 1983 claims against defendant Deputy Broussard and defendant Deputy Smith because they are entitled to qualified immunity, and those claims are dismissed with prejudice.  The motion is GRANTED with regard to the Section 1983

claims against Sheriff Melancon in his official and individual capacities because the plaintiff failed to prove that Sheriff Melancon violated the decedent's Constitutional rights, and those claims are dismissed with prejudice.  The motion is GRANTED with regard to the punitive damages claims asserted against the deputies under Section 1983 because the plaintiff failed to prove that the deputies acted with evil motive or reckless disregard for the decedent's rights, and those claims are dismissed with prejudice.

The court declines to exercise supplemental jurisdiction over the plaintiff's state-law claims, and those claims are dismissed without prejudice.

Signed at Lafayette, Louisiana, this 21st day of February 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

-31-